UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          CRIM. NO. 3:12CR84(AWT)

v.

JILL PLATT                         July 11, 2013

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States respectfully submits this memorandum for the sentencing of the defendant Jill Platt ("Platt"), which is scheduled for August 5, 2013.

I.      INTRODUCTION AND BACKGROUND

On February 20, 2013, a jury swiftly convicted Platt of Conspiracy to Defraud the Internal Revenue Service, in violation of 18 U.S.C. § 371 (Count One); two counts of Filing a False Tax Return, in violation of 26 U.S.C. § 7206 (Counts Two and Three); multiple counts of Wire Fraud, in violation of 18 U.S.C. § 1343 (Counts Six through Seventeen); and one count of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count Eighteen).

II.     FACTS AND CIRCUMSTANCES OF DEFENDANTS' CONDUCT

The Government concurs with the Presentence Report's ("PSR") version of the offense conduct, PSR at ¶¶ 5-41.

In sum, the evidence at trial established that between 2008 and 2011, Donna Bello, Jill Platt, and BetteJane Hopkins, among others, conspired to defraud the United States by impairing and impeding the Internal Revenue Service (IRS) from accurately ascertaining, assessing and collecting federal income taxes and further conspired to commit wire fraud. They did this by engaging in a scheme in which they organized and operated "gifting tables," which are illegal pyramid schemes.

The conspirators failed to report the cash they received through this scheme on their tax returns, and advised other participants that they too did not need to pay taxes on the money they received. Donna Bello, Jill Platt, and BetteJane Hopkins all personally benefitted from their participation and leadership roles on the gifting tables. The evidence also showed that Donna Bello and Jill Platt attempted to conceal this scheme of unreported income through numerous affirmative acts.

The evidence demonstrated that the individuals who were defrauded in this case, and who were recruited by Donna Bello, Jill Platt, BetteJane Hopkins, and others to join the gifting tables, relied on the conspirators' material misrepresentations, which included that: giving $5,000 to a complete stranger qualified as a gift; the gifting tables never failed; the "gift" was not taxable; that lawyers and accountants had reviewed and approved the "gifting tables" as legal; a $5,000 gift would yield a $40,000 return; and withholding information about their earnings, that is, hiding it from the IRS, was entirely legal. Witnesses further testified that, had the defendants not told them the gifting tables were legal, and that they would earn $40,000, they would not have joined.

In short, the scheme involved investing $5,000 for a return of $40,000. The $40,000 was paid by the eight women at the bottom of the pyramid who were recruited to join, and who were willing to contribute $5,000 cash each. That money then went to the woman at the top of the pyramid. Once the woman at the top collected her money, the table would split, and the two women below her moved up to the top position on the table, thereby forming two new tables.

The majority of witnesses who testified at trial identified Donna Bello and Jill Platt as the leaders and organizers of the gifting tables scheme in Connecticut. These witnesses, as well as other documentary evidence admitted at trial, further established that the gifting tables were an extensive operation that involved more than 1,000 women. The gifting tables, which were marketed

as a woman's support and networking group, were actually the means by which women at the top of the pyramid received money. There were numerous pyramids operating at any given time. The only way for women on the gifting tables to recoup their money, and more, was to recruit new members to invest $5,000.

Despite their claims that the scheme was legal, the defendants repeatedly instructed the participants that they should not deposit the money they earned in the bank, but if the money had to be deposited, it should be done in small increments. The defendants frequently explained to new members that the important thing was to avoid raising red flags or alerting the IRS. Indeed, the evidence at trial established that this was commonly told to participants by the defendants and their coconspirators. The witnesses further testified that they trusted the defendants and relied on the defendants' representations.

This same information was commonly used at training sessions run by the defendants and their coconspirators. The general structure was the same as the larger meetings where participants were taught what words could be used and not used; they were taught how to structure cash deposits in an effort to conceal their conduct from the IRS and they were taught how to present the gifting tables as not being a pyramid scheme despite clearly being one.  Documents generated as part of those training sessions were admitted into evidence and made clear the true purpose behind the gifting tables–a way to continuously making money and avoiding detection by the IRS. For example, Government Exhibits 14, 110, 119, 130, 200 and 202 are all examples of documents generated from training sessions and thereafter utilized by the defendants and other members of the conspiracy.

III.     SENTENCING GUIDELINES

    A.     Guideline Range Calculation

The Government submits that the defendant's adjusted offense level is 33. The defendant appears to be in Criminal History Category I, which results in an advisory sentencing range of 135-168 months' imprisonment. The Government submits that this is a correct calculation of the Guidelines and as such asks that the Court impose a substantial term of imprisonment that comports with the purposes of sentencing.

    B.     Offense Level Calculation

The defendant's applicable base offense level under U.S.S.G. § 2B1.1 is seven. The Government submits the following additions to the base offense level should also be made:

    *1.     Loss Amount – 18 Level Increase*

Eighteen levels should be added because the intended loss is over $2,500,000 but less than $7,000,000. *See* U.S.S.G. § 2B1.1(b)(1)(J). Application Note 3(C) instructs that:

> the [C]ourt need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence . . . . The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following: . . . (iv) the approximate number of victims multiplied by the average loss to such victim, . . . [and] (vi) more general factors, such as the scope and duration of the offense and revenues generated by similar operations.

The Second Circuit "has affirmed loss determinations extrapolated from an average loss amount based on known data in cases where the instances of theft, embezzlement or fraud are numerous." *United States v. Davis*, 41 Fed. Appx. 493, 496 (2d Cir. 2002) (multiplying average annual losses by number of years in conspiracy). This approach has also been approved in other circuits. *See*, *e.g.*, *United States v. Jones*, 372 Fed. Appx. 530 (5th Cir. 2010) (approving a loss determination that

4

extrapolated loss from one fraud trip/spree to three others for which loss was unknown); *United States v. Carroll*, 436 Fed. Appx. 184 (approving an extrapolation of loss where agent testified that "the government was not able to identify the full amount of loss due to the number of victims, not all of whom could be found, and the nature of Defendant's scheme, which involved counterfeit money orders, not all of which could be traced").

According to U.S.S.G.§1B1.3(1)(B), relevant conduct for the purpose of sentencing includes:

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

In assessing whether the defendant should be held accountable for conduct of the conspiracy, the Court must make two particularized findings:

> First, it must determine the scope of the criminal activity agreed upon by the defendant.  Second –  and only if it finds that the scope of the activity to which the defendant agreed was sufficiently broad to include the conduct in question – the court must make a particularized finding as to whether the activity was foreseeable to the defendant.

*United States v. Mulder*, 273 F.3d 91, 118 (2d Cir. 2001) (internal quotations omitted).

Among the factors to be considered by the Court in making these particularized findings are whether the participants in the crime "pool their profits and resources," the "defendant's assistance in designing *and* executing the illegal scheme," and "what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct."  *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995).  In *United States v. Uganda Nash*, the Court approved holding the defendant responsible for the entirety of the criminal scheme, citing factors that included him

participating in recruiting accomplices, accompanying accomplices on illegal "shopping trips," taking possession of computers used to create fraudulent checks, discussing with co-conspirators the conduct of the business, threatening a co-conspirator in order to protect the scheme, and attempting to expand the conspiracy to a new bank. 338 Fed. Appx. 96, 98 (2d Cir. 2009).

Applying the two-pronged test here, the Court should find first that the scope of the criminal activity agreed upon by the defendant included the entirety of the criminal activity and all of the loss attributable to it. The defendant was an integral participant in the frauds being perpetrated in that she was an organizer and leader of the gifting tables in Connecticut and elsewhere. Without the defendant's participation, the operation would have been far less successful. The defendant was a necessary cog in the success of the jointly undertaken criminal activity – engaging in a scheme in which she organized and operated an illegal pyramid scheme; failed to report the cash received through this scheme on her tax returns, and advised other participants that they did not need to pay taxes on the money they received; and attempted to conceal the scheme through numerous affirmative acts proven at trial.

Witnesses repeatedly testified that at virtually every meeting Platt assured them that: the "gifting tables" had been reviewed by lawyers and accountants; the tables were legal; all of the money earned was tax free; participants did not need to report their earning to the IRS; and the gifting tables were not a pyramid scheme. Despite their claims that the scheme was legal, the defendant and her coconspirators instructed participants to avoid depositing earnings in the bank unless it was unavoidable, in which case to make deposits in small increments. The defendant and her coconspirators warned that the important thing was to avoid raising red flags or alerting the IRS. Indeed, the evidence at trial established that this was commonly told to participants by the defendant

6

and her coconspirators. The witnesses testified that they relied on the representations made by Platt.

This same information was commonly used at training sessions run by the defendant and her coconspirators. The general structure was the same as the larger meetings where participants were taught what words could be used and not used; they were taught how to structure cash deposits in an effort to conceal their conduct from the IRS and they were taught how to present the gifting tables as not being a pyramid scheme despite clearly being one.  Documents generated as part of those training sessions were admitted into evidence and made clear the true purpose behind the gifting tables–a way to continuously making money and avoiding detection by the IRS.  For example, Government Exhibits 14, 110, 119, 130, 200 and 202 are all examples of documents generated from training sessions and thereafter utilized by the defendants and other members of the conspiracy. Witnesses consistently testified that Platt led such training sessions and oversaw many groups that were operating.  All of the above establishes the scope of the criminal activity agreed upon by Platt and others.

The second prong – that the activity and harm were foreseeable to the defendant – similarly compels application of the guidelines adjustment here. The conduct of the defendant's co-conspirators in making money based on the false representations outlined above was patently foreseeable: what was the point of participating in the "gifting tables"?  It was plainly foreseeable that the true purpose behind the "gifting tables" was to make money and then avoid paying taxes on that money.  Common sense dictates that the defendant knew that the "gifting tables" were a means to an end: a way to earn $40,000 on an initial $5,000 investment. It was thus reasonably foreseeable to the defendant that the information learned as part of participating in this scheme would be used

7

by co-conspirators and others to make money.[1]  Indeed, witness after witness testified that they joined the "gifting tables" to make money and they testified that Bello and others virtually guaranteed them that they would make money if they joined.  By the same hand, these witnesses testified that they would not have joined the gifting tables had they not been misled to believe that they would make money and that the scheme was legal.

The evidence further establishes that Platt and others often targeted women who were in financial distress.  Participants took loans against their retirement accounts, cash advances on credit cards, borrowed money from friends and family, used back child support checks, used inheritance money, did not pay bill so that they could join the gifting tables and borrowed money from the defendants.  The evidence established that the scheme did not work unless new recruits joined and parted with $5,000.  In the end, the "gifting tables" were a vehicle to make tax-free money based on false statements and representations, and Platt was one of the principal promoters and leaders of the groups thereby making those participants' conduct reasonably foreseeable to her.

   2.    *Greater than 50 Victims - 4 Level Increase*

Four levels should be added because the offense involved fifty or more victims. *See* U.S.S.G. § 2B1.1(b)(2)(B).  Here, the testimony at trial from several witnesses who participated in the scheme was that there were over a 1,000 participants actively on the "girting tables." *See United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008) and Application Note 1 to U.S.S.G. § 2B1.1.  In addition, these same witnesses testified that not only did they lose their $5,000 investment, multiple other

---

[1]The government provided a spreadsheet to Probation and defense counsel which lists out those individuals that earned money from their participation on the gifting tables.

individuals lost their money as well. As such, the record adequately proved by a preponderance of the evidence that an enhancement for greater than fifty victims is appropriate.

### 3. Role Enhancement - 4 Level Increase

Four levels should be added because the defendant was an organizer or leader of the criminal activity that involved five or more participants or was otherwise extensive. *See* U.S.S.G. § 3B1.1(a). Before imposing a role adjustment, the sentencing court must make specific findings as to why a particular subsection of U.S.S.G. § 3B1.1 adjustment applies. *United States v .Ware*, 577 F.3d 442, 451 (2d Cir. 2009). To qualify for a four-level enhancement under subsection (a), the district must find that (1) the defendant was an "organizer or leader of a criminal activity" (organizer/leader prong) and (2) that "the criminal activity involved five or more participants or was otherwise extensive" (participant prong). U.S.S.G. § 3B1.1(a). In determining whether a defendant meets the organizer/leader prong, the district court should consider "the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." *United States v. Si Lu Tian*, 339 F.3d 143, 157 (2d Cir. 2003) (citations and internal quotation marks omitted); *see also* U.S.S.G. § 3B1.1(a), comment (n. 4). In addition, that one conspirator occupied a leadership role does not preclude a court from finding that another conspirator was also a leader under Section 3B1.1(a). *Si Lu Tian*, 339 F.3d at 157 ("Our cases recognize that one conspirator's leadership role is not dispositive on the question of whether another was also a leader.") (citations and internal quotation marks omitted).  In order to satisfy the second prong, the sentencing court must find either that the criminal activity involved "five or more participants" or that the criminal activity was "otherwise extensive." *United States v. Archer*, 671 F.3d 149, 165 (2d Cir. 2011) (citing U.S.S.G.

9

§ 3B1.1, comment. (n. 1)). A "participant" is someone who is "criminally responsible for the commission of the offense," but that person need not have been convicted. *Si Lu Tian*, 339 F.3d at 156 (citing U.S.S.G. § 3B1.1, comment. (n. 1)). Significantly, in determining the number of participants involved in the criminal activity, the defendant can be counted as one of the participants. *United States v. Paccione*, 202 F.3d 622, 625 (2d Cir. 2000) (per curiam).

Furthermore, although the criminal activity at issue must involve five or more participants or be otherwise extensive, the Guidelines require only that the defendant be an organizer or leader of one or more of those participants -- not of all the participants -- for a four-level enhancement to be appropriate. *Si Lu Tian*, 339 F.3d at 156 (2d Cir. 2003); *see also* U.S.S.G. § 3B1.1, comment. (n.2).

Here, the evidence readily establishes that: (1) Platt was an organizer and leader of criminal activity, and (2) the criminal activity involved five or more participants. U.S.S.G. § 3B1.1(a). As detailed above, Platt, together with Bello and Hopkins, led and promoted the "gifting tables" organization that operated along the shoreline and elsewhere for the time period charged in the Indictment. Indeed, witness after witness testified that Platt oversaw the "gifting tables" and that she was integral in providing training to other participants on the "gifting tables." Moreover, the testimony at trial established that there were well over five women involved in the criminal activity.

In sum, because the evidence proved by a preponderance of the evidence that Platt was a leader and organizer of criminal activity that involved five or more participants, the PSR correctly included a four-level enhancement for the defendant's leadership role in the offense.

IV.  DISCUSSION

Under 18 U.S.C. § 3553(a), the sentencing "court shall impose a sentence sufficient, but not

greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."
The statute then provides that "[t]he court, in determining the particular sentence to be imposed,
shall consider:"

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed—

    (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)     to afford adequate deterrence to criminal conduct;

    (C)     to protect the public from further crimes of the defendant; and

    (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5)     any pertinent policy statement [issued by the Sentencing Commission];

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

    As explained below, the § 3553(a) factors justify a substantial term of imprisonment.

A.  <u>The Nature and Circumstances of the Offense</u>

By conspiring to defraud the IRS and engaging in wire fraud offenses, and by encouraging others to do the same, the defendant committed a serious crime over the course of several years.  Tax offenses are serious, costly, and damaging to our nation's system of taxation. The Internal Revenue Code, § 6151(a) sets forth the general rule of our voluntary federal tax system:  "Except as otherwise provided, when a return of tax is required under this title or regulation, the person required to make such return, shall, without assessment or notice and demand from the Secretary, pay such tax to the internal revenue officer with whom the return is filed, and shall pay such tax at the time and place fixed for filing the return."

Here, the defendant always had the means to pay her taxes, but instead she knowingly avoided her obligations. The money the defendant acquired from her upper echelon position on multiple tables was used for her own personal benefit, and none of it was used to satisfy her tax liabilities.  Moreover, the defendant made several false representations as outlined above over the course of several years in an effort to enrich herself and those within her inner circle.

The seriousness of the defendant's fraudulent conduct, the amount of taxes she deliberately did not pay, the years of making significant income available to pay her taxes, and her use of the money for her own benefit, all support a substantial sentence of imprisonment. The defendant acted without regard to her responsibilities as a citizen to adhere to the laws of this country. Tellingly, her unabated criminal conduct was not borne out of economic necessity, deprived upbringing, or lack of formal education and opportunity.

Compounding the serious nature of the offense is the defendant's unwavering message to her recruits that they too should not pay taxes on gifting table money and that everything they were doing

12

was legal and approved by lawyers and accountants. Compounding the seriousness of the offense even further, the defendant and others advised participants how to conceal the money, telling them that if the money had to be deposited, it should be done in small increments in an attempt to avoid raising "red flags" or alerting the IRS.  Our criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system that funds the nation's coffers.  Criminal tax and fraud prosecutions serve to punish the violator and promote respect for the laws that citizens have an obligation to follow.  The defendant's fraudulent conduct and corresponding failure to pay the taxes when she had the financial ability to due so warrants a substantial sentence of imprisonment.

     B.  <u>The Defendant's History and Characteristics</u>

As the PSR states, the defendant had a good childhood and she is in relatively good physical and mental health.  She describes herself as a hard worker and very committed to her family and community.

The PSR, however, do not distinguish the defendant from most other white-collar criminals. *See United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her"). The case law is replete with convicted felons who, despite their criminal conduct, appear to be compassionate and praiseworthy people. The Sentencing Guidelines do not, however, authorize a downward departure merely because a defendant has shown kindness, even considerable kindness, to others or because she has been an active member in the community.  Also, the

Guidelines already take into account the defendant's lack of a criminal record by according her a Criminal History Category of I.

The argument that the defendant has been punished enough by the loss of prestige or loss of her good name as a result of the prosecution in this case should be rejected. First, history has shown that the risk of a felony conviction alone has not been sufficient to deter tax cheats. Second, according to this logic, one who is successful, wealthy, and highly regarded should not be sent to jail for committing the same crime that would justify a sentence of imprisonment for a less well-heeled and well-regarded defendant. This argument ignores the premise that from those who have the greatest advantages in life, more is expected. The Court should reject the notion that successful people (like the defendant) should be sentenced more lightly than the poor and powerless because, for the former, the humiliation and shame of conviction alone (without any prison sentence) is more devastating than it would be for those who have enjoyed fewer advantages in life. Here, the defendant has a history of engaging in fraudulent conduct to enrich herself and in under-reporting her income in order to pay less taxes in order to benefit herself and to the detriment of her fellow citizens.

C. The Sentence Must Promote Respect for the Law

The sentence in this case must reflect the seriousness of the offenses, promote public respect for the law, and demonstrate that as a society we treat very seriously crimes involving the failure to comply with our voluntary tax laws. When well-to-do citizens who earn income from engaging in a fraudulent scheme, like the defendant, repeatedly and brazenly ignore our country's laws, they should be punished with more than a pat on the wrist. A prison sentence here will rebut the

14

commonly expressed sentiment that engaging in fraud and cheating on your taxes is no big deal, and that it is acceptable to not pay taxes.

    D.  <u>The Court Should Consider General Deterrence</u>

    One of the factors the Court must consider in imposing sentence is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  General deterrence is an especially important goal in sentencing for criminal tax offenses, because criminal tax prosecutions are relatively rare. The Sentencing Commission wrote the following about the deterrent value of sentences in tax cases.

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system.  Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws.  Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.  Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

 U.S.S.G. ch 2, pt. T, introductory cmt.

    Moreover, in tax prosecutions there is good reason to impose Guidelines sentences as opposed to the more lenient probationary sentences sought by tax evaders.  As the Guidelines commentary explains:

> Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months.  This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length.  As a result, the number of purely probationary sentences will be reduced.

Guideline Commentary, Section 2T1.1.

Indeed, criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying what an appropriate sentence is for the defendant. As such, probation does not reflect the seriousness of the offense, promote respect for the law, provide just punishment or provide adequate deterrence to the defendant or to others who might engage in similar conduct in the future. This is particularly important in this case in light of the fact that the operation of the gifting tables in Connecticut involved over a thousand women and arguably is still in existence.

In addition, the criminal conduct occurred over the course of several years and involved counseling and training others to violate the law. Consequently, a substantial sentence of imprisonment followed by a period of supervision will serve as a general deterrence to others who may willfully choose to ignore the tax laws by placing their own financial needs ahead of their obligation to report all of their income derived from a business activity and to pay taxes due and owing. Such a sentence will further send a message to those who are still participating on the gifting tables or who are contemplating doing the same that there will be substantial punishment for engaging in such fraudulent conduct. A sentence that does not include a period of imprisonment sends the wrong message. As such, a term of incarceration in the case at bar will deter like-minded individuals and send a strong message that such criminal activity and flagrant disregard of the law will not be tolerated by this Court. *See* 18 U.S.C. § 3553(a)(2)(B).

E.     Restitution Is Appropriate for Six Identified Gifting Tables Victims and U.S. Treasury

The defendant Platt properly concedes that the mandatory restitutions provision of 18 U.S.C. § 3663A governs the Title 18 offenses in this fraud case. Def. Platt Sent. Memo. at 17. The

16

defendant asserts that this case is "sufficiently complicated so as to make the Mandatory Victim

Restitution Act of 1996 ("MVRA"), inapplicable. *Id*. at 4. By apparently referring to the draft PSR,

the defendant Platt mistakenly asserts at page 19 of her memorandum that no amount of restitution

has been set.

In March 2013, the Government mailed to more than 60 identified victims of the Gifting

Tables a letter indicating that they may be a victim of federal criminal conduct in this case. The

letter asked the person to complete an enclosed victim impact statement that provided space for them

to discuss their feelings they may experienced as a result of this crime, how the crime affected them,

if they incurred financial losses from the crime, whether they wanted restitution for compensation

for their loss of money, and whether they were assessed any additional taxes, penalties, or interest

by the IRS as a result of this case. Six Gifting Tables participants, each of whom testified at the trial,

completed and returned the statements requesting restitution as a victim. The names of the six

victims and the amount of restitution each seeks is set forth at paragraph 96 of the PSR. The total

amount of restitution is $38,000.

The Government respectfully submits there is nothing complex or complicated about six

victims seeking restitution for having given money to participate in the fraudulent Gifting Tables

scheme. Therefore, an order for restitution in the amount of $38,000, joint and several for the

defendants Bello and Platt, is warranted. 18 U.S.C. § 3664(h).

The defendant Platt was also convicted of filing a false federal tax return for calendar year

2009 in violation of 26 U.S.C. 7206(1) (Count Four) because she failed to report as income the

money she received from participating on the Gifting Tables. Platt received $60,000 from Gifting

Tables participants in 2009. PSR ¶ 33. The IRS has calculated that after adding the $60,000 to the

income the defendant and her husband reported for 2009, the total corrected tax liability is $36,544, resulting in a tax deficiency of $17,456 and a fraud penalty of $13,092.

With respect to Title 26 offenses, unlike Title 18 offenses, the Court does not have authority to impose restitution as part of the sentence, but may order restitution as a condition of supervised release or probation.  18 U.S.C. §§ 3356, 3356(b) and 3583(d); *United States v. Nolan*, 523 F.3d 331, 332-333 (5th Cir. 2008).  Although permitted, the Government is not seeking restitution to the U.S. Treasury for the conspiracy to defraud the IRS offense in violation of 18 U.S.C. § 371 (Count One). 18 U.S.C. § 3663A(c)(1)(A)(ii).  Those who participated in the Gifting Tables are obligated, where warranted, to file an amended federal tax return and pay any tax due and owing.

The Government requests that the defendant Platt be ordered to pay the U.S. Department of Treasury $17,456 plus penalties and interest, as a condition of probation or supervised release.  There is nothing complicated or confusing about the defendant's tax liability for 2009 that prevents the Court from entering a restitution order.  At the sentencing hearing, the Government, with the Court's permission, will further substantiate Platt's 2009 tax liability should she dispute it.

V.    CONCLUSION

The Government respectfully requests that the Court impose a substantial sentence of imprisonment in this matter.

Respectfully submitted,

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY

*/s/ Douglas P. Morabito*

DOUGLAS P. MORABITO
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT20962
157 Church Street; 23rd Floor
New Haven, Connecticut  06510
(203) 821-3810
Douglas.morabito@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 11, 2013 a copy of the foregoing Government's Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ *Douglas P. Morabito*

DOUGLAS P. MORABITO
ASSISTANT UNITED STATES ATTORNEY
Federal Bar Number: CT20962
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700