UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
--------------------------------------------------- X
                                                    :

UNITED STATES OF AMERICA          :
                                                    :

               v.                         :          No. 3:12-cr-00084-AWT
                                                      :

JILL PLATT,                            :
                                                      :

                     Defendant.          :
                                                      :
--------------------------------------------------- X


# SENTENCING MEMORANDUM OF JILL PLATT

James Darrow
Assistant Federal Defender
Federal Defenders of New York, Inc.
One Pierrepont Plaza
16th Floor
Brooklyn, New York 11201
Tel. (718) 407-7419

Jill Platt respectfully submits this memorandum in connection with her resentencing, currently scheduled for May 12, 2016 at 2 p.m.

## PRELIMINARY STATEMENT

Ms. Platt is a very different person than the one this Court sentenced previously. She no longer disputes her guilt. The approximately seven months she spent in prison helped her to see the gifting tables in a very different light than she did before. She is acutely aware of the harm she caused. She accepts responsibility for it. And she is ashamed of it. It was antithetical to the good works she has tried to accomplish her entire life, no matter her own circumstances.

Ms. Platt's life has only gotten worse since her time in prison. Her son Jonathan died shortly after her release. His death left her with no one to support her financially—she depended for over 40 years on her husband's income, but he died shortly before trial, and her one remaining son cannot afford to care for her. She is impoverished, encumbered by crushing debt, and cannot provide for herself. Her status as a felon puts most office jobs out of reach. She tries her best with odd jobs, but her health is failing. She depends entirely on the kindness of friends to get by.

We believe this Court can proceed directly to the resentencing. To be sure, the government's prior approach to loss amount—using gain as a proxy—has several complex legal problems that would require a *Fatico* to resolve, including

but not limited to the problems identified by the Second Circuit. But the existing record provides a basis to calculate actual loss that is a just and reasonable alternative to the problematic gain approach. Indeed, the government has indicated that it may agree. Given a Guidelines range derived from this approach, a similar variance to the one the Court granted last time results in a sentence of time served.

We respectfully submit that a time served sentence is just. Jill Platt is a 68-year-old destitute widow, who has no prospects of comfort in her old age. Her further incarceration would not serve the purposes of sentencing.

## BACKGROUND

Jill Platt was convicted by a jury of tax and wire fraud in connection with her participation in "gifting tables." The indictment charged Ms. Platt with conspiracy to defraud the IRS in violation of 18 U.S.C. § 371 (Count 1); filing a false tax return in violation of 26 U.S.C. § 7206(1) (Count 4); conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count 18); and four counts of substantive wire fraud in violation of 18 U.S.C. § 1343 (Counts 7, 10, 11, 17). Ms. Platt was found guilty on all counts.

## A.    Ms. Platt's Participation In The Gifting Tables

### 1.    The Gifting Tables

The gifting tables were women's groups organized around a financial element. The tables were structured like pyramids with four levels of

participants—eight "Appetizers," four "Soup and Salads," two "Entrees," and one "Dessert"—with new women starting as Appetizers and progressing up the levels as additional women joined. (Tr. 201-02). To join, a woman would give $5,000 to the woman in the Dessert position (the leader of the table). After a table was completed, the Dessert could receive $40,000 from the Appetizers, at which point the table would split in two, with former Entrees becoming a Dessert on each new table. Everyone else would also progress upward, and participants would invite more members to join. (*Id.*).

The issue at trial was whether the gifting tables were a tax and wire fraud scheme, or whether the defendants believed in good faith that the tables were legal. The jury rejected the good-faith defense, finding that the defendants made misrepresentations about the nature of the tables and their tax consequences. Ms. Platt's conviction has been affirmed, and thus it is undisputed that her conduct was illegal.

### 2. Ms. Platt's Acceptance Of Responsibility For Her Offense Conduct

The Court will see at the resentencing that Ms. Platt now fully acknowledges her culpability, because she has come to look at the tables from a different perspective than she had before. She is deeply ashamed that her conduct, and the tables generally, resulted in significant harm to vulnerable women. As this Court observed at the prior sentencing, some women paid $5,000 to participate even

though they could not afford to do so.  (S. Tr. 74-75).  For example, one woman paid to join even though she was in bankruptcy, in the hopes she could pay off a balloon mortgage.  (*See id.* at 48-49).  Others drew from 401(k) accounts or child support.  (*Id.* at 49-51; *see also* PSR ¶¶ 43-48).

In her letter to the Court, Ms. Platt describes her feelings about the harm to these victims:  "I am ashamed of it, and that I was ever a part of it.  Many women lost money they could not afford to lose.  I accept responsibility for that."

3.     Ms. Platt's Motivation For Participating And Role In The Tables

Without minimizing Ms. Platt's culpability, we submit that the full picture of her particular conduct should counsel toward leniency in her sentence.  In particular, Ms. Platt's selfless motivation for taking part in the tables, and her role relative to others who received no jail time or were not charged, should be considered in the Court's "individualized application of the statutory sentencing factors for sentencing."  *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010); *see also United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (in light of "the Supreme Court's emphasis on 'individualized' sentencing," a sentence must encompass "the totality of circumstances in the case").

a.     Ms. Platt Used The Money To Help Others.

Ms. Platt joined the tables not out of greed, but because she needed money to pay for her late husband's pacemaker.  (S. Tr. 19-20).  Until his death shortly

before trial, the family depended on Mr. Platt's salary, and later his pension, as a superintendent at a Connecticut quarry.  (PSR ¶ 72).  Occasionally, Ms. Platt brought in modest income from her small painting business and working nights at odd jobs, but the economic crisis eliminated even that small buffer.  (PSR ¶ 81-82; S. Tr. 36).  Accordingly, when Mr. Platt contracted a heart condition, his pacemaker "caused significant financial problems" for the family, because they could not afford health insurance.  (PSR ¶ 71).

Ms. Platt participated in the gifting tables, and used most of the money she received from them, to pay for her husband's medical insurance; she gave the rest to other women.  (S. Tr. 37).  Accordingly, while it is true, as this Court found at the prior sentencing, that Ms. Platt "was driven by the money" to participate (S. Tr. 75), it is also true that she used that money to help others.

Nor was this the only way Ms. Platt helped others through the tables.  As the Court will recall, participation in the gifting tables involved, in addition to the financial element, a substantial charitable and philanthropic component.  It is undisputed that Ms. Platt was deeply involved in these charitable works: donating money, clothing, and Mother's Day gifts to victims of domestic abuse; contributing to families' mortgage and rent payments so they would not lose their homes; organizing food deliveries to soup kitchens; and buying a van for a local disabled man.  (*See* Letter of Sally Bolstridge; Letter of Cindy Ziegler, May 1, 2013; Letter

of Gale Plancon, May 1, 2013; Tr. 3535-37 (testimony of Sharon Bride Caltabiano)). To be sure, these actions were bound up in other conduct the jury found to be criminal. But they were also real acts of charity that yielded real and meaningful benefits to many victims of domestic abuse and other vulnerable members of Ms. Platt's community.

This charitable motivation is of a piece with Ms. Platt's character more generally. She has spent a lifetime being generous to others while living under extremely modest financial circumstances. Ms. Platt was raised in a working-class family. (PSR ¶ 67; S. Tr. 37). Her father was estranged and provided no child support. (PSR ¶ 71). Ms. Platt became the caregiver of the family at age 13, after her mother and stepfather became incapacitated by mental illness. (PSR ¶¶ 68, 70). Nevertheless, after decades of estrangement, she brought her father into her home shortly before his death so he could have "a good ending." (PSR ¶ 71). Ms. Platt also took in and cared for her elderly mother-in-law and stepfather until they died. (PSR ¶ 73). Family and friends have described Ms. Platt's central role in supporting others through times of crisis. (PSR ¶ 74; Letter of Christopher Beach; Letter of Conway Beach; Letter of Catherine-Anne DiNoto; Letter of Barbara P. Lund).

b.    Ms. Platt's Role Was Similar To Women Who Received
      Probation Or Were Not Charged.

Ms. Platt's role in the offense also counsels toward leniency in her

sentencing.  Her part was similar to other "spoke[s] on the hub" (S. Tr. 11) and

"senior sisters" (Tr. 25) who, despite substantial evidence and equal culpability,

received no term of imprisonment or were never charged.

As the Court will recall, Ms. Platt's co-defendant Bettejane Hopkins

received probation.  Hopkins, like Ms. Platt, had no criminal history; was a

member of the communication "hub" (Tr. 745); was a "senior sister" in the tables;

and made almost the same amount as Ms. Platt (S. Tr. Ex. 1 (chart reflecting

"Money Received by Women on the Gifting Tables" ("Gov't Chart") showing

receipts of $90,000 for Ms. Platt and $89,500 for Hopkins)).  Moreover, while

Hopkins agreed to cooperate and took steps to return some of the money she made,

she did not provide substantial assistance to the government.  To the contrary, the

government believed that Hopkins has a "low priority of compliance" with the law;

unlike Ms. Platt, did not join the tables "out of any real economic necessity"—

indeed, Hopkins was a "wealthy and successful business owner[];" and used her

profits "for her own personal benefit."  (Gov't Mem. In Aid Of Sentencing,

Document No. 224, at 4, 6).  Hopkins's probationary sentence thus provides a

crucial benchmark for this Court in fashioning a sentence for Ms. Platt.

Other major players also received probation, or were not charged. For example, the government permitted Nancy Dillon and Eileen Brennan to plead guilty to misdemeanors, and the Court sentenced both to probation, even though both joined before Platt, and Brennan's own personal gain was calculated by the government to be $60,000 (Gov't Chart). Several other "senior sisters," who the government viewed as members of the conspiracy, have (to our knowledge) still not been charged, even though they had similar roles to Ms. Platt (*see, e.g.*, Tr. 745, 777-78, 1212-13 (Marie Bowlby and Deb Hastings were also "spokes")), and made approximately as much or more than the government alleged Ms. Platt made (*see* Gov't Chart (Capotosto ($181,500); Hastings ($77,000); Bowlby ($70,000); Grigor ($90,000); *compare* Platt ($75,000))).

## B.     The Prior Sentencing

On August 13, 2013, this Court sentenced Ms. Platt to a term of 54 months' imprisonment, to be followed by three years of supervised release.

### 1.     The Prior Loss Amount And Guidelines Calculation

Because Ms. Platt was convicted of both tax and wire fraud, the Court calculated the loss amount by aggregating the tax and wire fraud losses that it attributed to Ms. Platt. (*See* S. Tr. 11-12); U.S.S.G. § 3D1.3(b). The Court previously calculated $882,500 in wire fraud loss and $247,100 in tax loss (*i.e.*,

28% of the wire fraud amount) (S. Tr. 9); U.S.S.G. § 2T1.1(c)(1) n.(A), for an aggregated loss of $1,129,600 (S. Tr. 11-12).

This enormously high loss amount was based upon the government's invitation to use the "gain that resulted from the offense as an alternative measure of loss" pursuant to U.S.S.G. § 2B1.1 cmt. n.3(B). At a *Fatico* hearing, the government introduced a chart identifying 40 table participants, along with supporting documentation. (*See* Gov't Chart). It used this evidence to try to prove the loss caused by the wire fraud conspiracy, based on the amount each participant gained in the 2008-10 time period, and whether (in the government's view) each woman was associated with the defendants. The government claimed that $1,418,000 of this alleged "gain to the members of the conspiracy" was "foreseeable" to Ms. Platt as relevant conduct of jointly undertaken criminal activity.

The Court adopted this approach, but calculated the "foreseeable gain" to Ms. Platt based only upon the gain to the identified participants that had a "material connection" to Ms. Platt in the relevant time period, and excluded others as to whom it was "unclear whether they were operating substantially independently of Platt." (S. Tr. 6-9). The Court attributed the $882,500 gain of 19 participants to Ms. Platt. (S. Tr. 9).

9

As discussed below, this approach vastly and incorrectly inflated the loss amount. It included all 19 participants' gain as gain to the conspiracy, even though the government never proved that those participants were all co-conspirators. It also included substantial amounts that were not actual losses to victims.

The inflated loss amount, in the aggregate, yielded an inflated base offense level of 22. (*Id.*;) U.S.S.G. §§ 3D1.2(d), 3D1.3(b), 2T1.1(a)(1), 2T1.9(a)(1), 2T4.1(I) (2012 Guidelines). With enhancements, the applicable adjusted offense level was 29. (S. Tr. 12-13). Because Ms. Platt had no criminal history, the Guidelines range was 87-108 months.

2.     The Bases For Ms. Platt's Prior Sentence

The Court used that Guidelines range as the starting point of its sentencing analysis. It found that, unlike in "heartland" cases encompassed by the Guidelines, Ms. Platt was not a "leader" and "gained money on an equal basis with other participants." (S. Tr. 67-69). On the other hand, the Court put "significant weight" on Ms. Platt's culpability, and expressed the view that the gravity of her conduct and its harm to victims was not "on the radar screen for this defendant." (*Id.* at 69, 74-75). It therefore imposed a sentence 33 months below the bottom of the range. (*Id.* at 69).

3.    Ms. Platt's Incarceration

Ms. Platt surrendered for her prison term on October 15, 2013. The Second Circuit granted bail pending appeal, and Ms. Platt was released on May 7, 2014, having served approximately seven months.

**C.    The Appeal And Remand**

The Second Circuit affirmed the defendants' convictions, but vacated and remanded the causes for resentencing. *United States v. Platt*, 608 F. App'x 22, 25 (2d Cir. 2015) (summary order).

The Court of Appeals held that this Court erred in calculating the loss amount, because it did not make "particularized findings concerning whether the conduct of other gifting table participants fell within the scope of defendants' agreement, and whether this conduct was foreseeable to defendants." *Id.* at 30. The Circuit recognized that the Court had "eliminated from the loss amount calculation gains to some participants with apparently tenuous connection to defendants," but required the Court to "explain[] what constituted a material connection" between Ms. Platt and the participants whose gain it did include, and "clearly indicate[] whether the gains attributed to defendants were foreseeable." *Id.* (citing *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995)). It therefore remanded for "particularized findings, consistent with our decision in *Studley*, relating to the scope of the conspiracy defendants agreed to and the foreseeability

of the gains caused by other table participants, and to recalculate the total amount of loss attributable to each defendant." *Id.* at 31.

The Court of Appeals also made clear that, in its view, the correct loss amount was significantly lower than previously calculated. It wrote:

> [W]e harbor significant doubts regarding whether all of the women whose gain was used to calculate defendants' loss amounts were properly considered members of the fraud conspiracy. As we have noted "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." [*United States v.*] *Getto*, 729 F.3d [221,] 234 n.11 [2d Cir. 2013) (internal quotation marks omitted). For the purposes of sentencing, mere "knowledge of another participant's criminal acts" or "of the scope of the overall operation" does not make a defendant criminally responsible and it is less likely that an activity was jointly undertaken if the participants worked independently and did not "pool their profits and resources." *See Studley*, 47 F.3d at 575.

*Id.* The Court did not reach Ms. Platt's alternative arguments that the prior calculation improperly included gains to non-co-conspirators and gains that were not derived from actual losses to victims. *Id.* at 30-31.

**D.     The Record On Remand**

The state of the record as to Ms. Platt's offense conduct is unchanged from the prior sentencing. *See supra* pp. 2-7. The record as to loss amount is also unchanged. *See supra* p. 8. Nor do we anticipate another *Fatico* hearing will be necessary. For the reasons set forth below, we believe the current record is sufficient to establish a reasonable loss amount the parties can agree upon. *See infra* p._.

However, Ms. Platt herself has changed substantially since the last sentencing. For one thing, the harm caused by the tables is now very much on her radar screen. She served over half a year in prison, which caused her to reflect upon her conduct. As she writes to the Court, her bunkmate Tashauna catalyzed a change in her perspective:

> She taught me something I thought I already knew—that helping others is the most important thing in a person's life. I believed that the gifting tables were a way to help others. That is certainly why I joined them. But while the group gave me an opportunity to meet many fine people, be involved in many charitable events, and witness many positive changes in women's lives, those parts did not in any way exceed the damage it caused.

> That damage is not who I am. I am ashamed of it, and that I was ever a part of it. Many women lost money they could not afford to lose. I accept responsibility for that.

Ms. Platt has also suffered yet more personal loss. The Court will recall that her mother and her husband died in quick succession before trial. (PSR ¶¶ 70, 72). After she was released pending appeal, however, her son Jonathan also died. (5th Addendum to PSR at 1). Jonathan had moved to Connecticut to help his mother financially, but he experienced two undiagnosed heart attacks, and died from the complications. (*Id.* at 1-2). He was only 34. (*Id.* at 1). Ms. Platt's son Christopher is the only surviving member of her immediate family.

She is also now impoverished and awash in crushing debt: $200,000 in medical bills from her husband's care, a substantial mortgage, over $72,000 in credit card debt, and steadily growing tax liability. (PSR ¶ 69, Third Addendum to

PSR at 2; Second Addendum to PSR at 1-2; Fifth Addendum to PSR at 3). Ms. Platt has no meaningful income, and no real prospects for gainful employment. Her family depended for 43 years on her husband's income and pension, and at 68 years old she is too old for most full-time work. Indeed, she has found most office jobs will not hire her because she is a convicted felon. So she makes a little over $100 a week doing odd painting jobs or working occasionally as a caterer at Yale University. (Fifth Addendum at 2). Even that meager income stream will soon be gone, as she can no longer reliably perform the physical labor involved. (*Id.*).

Ms. Platt is thus almost entirely dependent for her livelihood upon on the charity of friends. Her letter recounts for the Court that friends have helped her with car repair, with occasional gifts, and with potential leads for work. But she cannot stand being a burden, and so she intends—if this Court permits—to try to start anew, by leasing her home and moving to Florida, where friends have offered her a job. We respectfully submit that this result would be just. The government itself has conceded that Ms. Platt has "learned her lesson." (Tr. 56). She is a 68-year-old widow who has lost a son, she is destitute, and she has already served over seven months in prison. As discussed below, sending her back for further incarceration would not serve the purposes of sentencing. We therefore request that the Court impose a sentence of time served.

ARGUMENT

**I. APPLICABLE SENTENCING LAW**

**A.  The Statutory Sentencing Factors**

A sentencing court is required to consider the factors set forth in 18 U.S.C.

§ 3553(a) in determining a reasonable sentence in each individual case.  *See United*

*States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49-50

(2007).

Section 3553(a) directs that "[t]he court shall impose a sentence sufficient,

but not greater than necessary, to comply with the purposes set forth in Section

3553(a)(2)]," which in turn sets forth that the applicable purposes are:

(A)  to reflect the seriousness of the offense, to promote respect for the
     law, and to provide just punishment for the offense;
(B)  to afford adequate deterrence to criminal conduct;
(C)  to protect the public from further crimes of the defendant; and
(D)  to provide the defendant with needed education or vocational training,
     medical care, or other correctional treatment in the most effective
     manner.

To arrive at such a sentence, the Court is further directed to consider these

additional factors set forth in Section 3553(a): (1) the nature and circumstances of

the offense and the history and characteristics of the defendant; (3) the kinds of

sentences available; (4) the kinds of sentence and the sentencing range established

in the Sentencing Guidelines; (5) pertinent policy statements issued by the

Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities

15

among similarly situated defendants; and (7) the need to provide restitution.  In every case, the sentencing court "must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.

The Guidelines range is just one of several factors set forth in Section 3553(a) that a district court must consider when imposing sentence.  *See also Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011).  A sentencing court "has broad latitude to 'impose either a Guidelines sentence or a non-Guidelines sentence.'"  *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009) (citation omitted).

### B.    Applicable Law On Loss Amount

#### 1.    The Prior Gain Calculation Has Three Legal Problems Which Must Be Resolved With A *Fatico* Hearing

There are three problems with the Court's prior loss calculation that must be resolved on remand, with another *Fatico* hearing, if the Court chooses to continue to use the gain to Ms. Platt and her co-conspirators as an estimate of the loss.  *See supra* pp. 7-8.

##### a.    The *Studley* Problems.

First, the Court must make the particularized *Studley* findings required by the Second Circuit's opinion.  That is, for every proposed co-conspirator whose gain is to be included, the Court must "explain[] what constituted a material connection" between Ms. Platt and that participant, and "clearly indicate[]"

whether that gain was "foreseeable" to Ms. Platt. 608 F. App'x at 30. The Court

must also attend to the Circuit's "significant doubts" that the prior gain amount is

correct. *Id.* at 31. Crucially, a demonstration by the government that Ms. Platt

merely had "knowledge of another participant's criminal acts" or "of the scope of

the overall operation" is not sufficient, and it is "less likely" that another's gain is

attributable to her if she "worked independently" and did not "pool their resources

and profits." *Id.*

Under this standard, if the government wishes to establish a gain amount that

includes anyone beyond the three defendants who were the subject of trial, another

*Fatico* hearing will be required. The present record is woefully insufficient. While

Ms. Platt may have known of others' "criminal acts" and "the scope of the overall

operation," the government has not remotely demonstrated that the women whose

gain it sought to include operated on the same tables as Ms. Platt, or pooled gains

with her, or were in any other respect sufficiently closely connected to her that

their own gains would be foreseeable to her.

For example, Marie Bowlby's gain contributed $70,000 to Ms. Platt's prior

loss amount. (*See* Gov't Chart). But while Bowlby was the subject of a *Geaney*

finding by the Court, and thus was found to be a co-conspirator for hearsay

purposes, that is not sufficient for *Studley* purposes. "'[T]he scope of conduct for

which a defendant can be held accountable under the sentencing guidelines is

*significantly narrower* than the conduct embraced by the law of conspiracy.'" 608

F. App'x at 31 (citing *Getto*, 729 F.3d at 234 n.11) (emphasis added). We believe

a *Fatico* hearing would show that Bowlby operated entirely on separate tables from

Ms. Platt, that they never shared any gains, and that the vast majority of their

activity was undertaken independently.

        b.      Eliminating Gain To Non-co-conspirators.

The Court must also ensure that all the women whose gain the government

seeks to include are properly considered to be Ms. Platt's co-conspirators. To

attribute losses caused by co-conspirators to a defendant as "relevant conduct," a

court must first find, and have a basis to find, that the individuals who caused the

losses were, in fact, co-conspirators who engaged in "jointly undertaken criminal

activity" with the defendant. U.S.S.G. § 1B1.3(a)(1)(B). The conduct of an

innocent participant is not jointly undertaken *criminal* activity. *See Getto*, 729

F.3d at 234 (§ 1B1.3(a)(1)(B) applies when there is "relevant, co-conspirator

conduct in question"); *United States v. Reifler*, 446 F.3d 65, 108 (2d Cir. 2006)

(losses must be "the outcome of the defendant's own offense conduct or of

foreseeable acts *by his co-conspirators in furtherance of the conspiracy*" (emphasis

added)); *United States v. Martinez-Rios*, 143 F.3d 662, 674 (2d Cir. 1998)

(defendant accountable for "reasonably foreseeable tax losses" only "as to jointly

undertaken criminal activity"); *United States v. Gordon*, 710 F.3d 1124, 1164 (10th

Cir. 2013) (gain "can be attributed to a defendant" when it is the reasonably foreseeable "gain of a co-conspirator").

The government never proved that all the women whose gain was included in Ms. Platt's prior attributed gain amount were members of the fraud conspiracy. This is no academic issue—many women who made money from the tables were undisputedly innocent. (*See, e.g.*, Tr. 2225-26, Tr. 2246, Tr. 2275 (Marianne Kelly); Tr. 953-54 (Staci Goldiamond); Tr. 2636 (Elena Cahill); Tr. 1023-24 (Kim Melluzzo)). Indeed, as to many of the women whose gain was previously attributed to Ms. Platt, the current record reflects nothing more than their good-faith participation in the tables:

- **Regina Rosa.** Rosa did not testify and was barely mentioned at trial. The sole evidence on Rosa was her deposition before the Connecticut Attorney General's Office, which established only that she made $35,000 from the tables and "associated" with the defendants. There was no evidence that Rosa ever made, or knowingly participated in, any of the alleged lies in the wire fraud conspiracy. She testified consistently and unambiguously that she believed the moneys she received were "gifts."

- **Nancy Grigor.** Grigor's gain contributed $90,000, or over 10%, to Platt's prior fraud loss amount (*see* Gov't Chart), yet there is no evidence that she made, or knew about, any of the false statements of the alleged wire fraud conspiracy. Grigor did not testify at trial; the prior *Fatico* hearing established only her profit from the tables and that she attended the meeting secretly recorded by Linda Valley. As the government conceded, the recording demonstrates only that Grigor was told that "many women had been to many lawyers and they all said it was legal." (S. Tr. 52). There is no evidence that Grigor knew this statement was false. To the contrary, she affirmatively stated at the time that she believed in "the legalities of our philanthropic cause."

- **Debra Hastings.** Hastings's gain contributed $77,000 to Platt's loss amount. Yet the record is devoid of evidence reflecting any knowing participation in the alleged fraud. For example, Hastings consistently testified that she believed that the tables were "fine and legal." (Tr. 3817; *see also* Tr. 3175-76; Tr. 3195; Tr. 3280).

- **Six Other Women.** The government itself appears to have concluded that six other women, along with Hastings and Rosa, whose gain was included previously were not co-conspirators but *victims*. The government sent each of these women letters inviting "victim impact statements" to help determine "the impact of this crime upon its victims." (The other women were Sandy Goodkind, Erica Grasso (Azarigian), Mary Beth Foley, Amy Leiner, Roleen Sheehan, and Felicia Zaffin).

        c.      Eliminating Payments That Were Not Losses.

The third problem to be resolved with the gain amount is to exclude money that was not actually lost by victims.

The Court's prior gain calculation included money paid to Ms. Platt's (presumed) co-conspirators from *other* (presumed) co-conspirators, who, by definition, were not victims. The failure to deduct those payments was error, because payments by co-conspirators are not losses to victims of the conspiracy. The fraud guideline defines "victim," in pertinent part, as "any person who sustained any part of the actual loss determined under [§2B1.1(b)(1) ]." U.S.S.G. § 2B1.1 cmt. n.1. "Actual loss" in turn, is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i). Payments among members of a conspiracy cannot be "harm that resulted from the offense," because conspirators are not harmed when they knowingly and intentionally pay

money into the conspiracy. These payments are thus not actual losses and may not enhance a defendant's sentence.

Case law interpreting the MVRA is instructive, because loss calculation considerations should be aligned in the Guidelines and restitution contexts. *See United States v. Lundquist*, 731 F.3d 124, 139 (2d Cir. 2013). The Second Circuit has interpreted similar language in the MVRA to require excluding "harm" to co-conspirators from the calculation of loss. In *Reifler*, the Court of Appeals explained that the MVRA defines "victim" as "a person directly and proximately harmed as a result of the commission [of the qualifying offense]." 446 F.3d at 121. The Court held in *Reifler* that a restitution order was legally unacceptable when it "has the effect of treating coconspirators as 'victims'" in this sense, *i.e.*, because co-conspirators do not suffer "harm[] as a result of the commission [of the offense]." *Id.* at 121, 127. Similarly, because the fraud guidelines treat only those who suffered "harm that resulted from the offense" as "victims," co-conspirators are not "victims" for fraud loss purposes.

The failure to deduct "losses" to co-conspirators is thus a fundamental legal error. *Reifler* held that an order requiring "'restitutionary' payments to the perpetrators of the offense of conviction, contains an error so fundamental and so adversely reflecting on the public reputation of the judicial proceedings that we may, and do, deal with it *sua sponte*." *Id.* at 127 . An equally fundamental error

arises when a district court erroneously includes "losses" to co-conspirators in its measure of fraud loss, because that measure is typically, as here, the principal driver of the defendant's sentence. Just as a perpetrator should not be rewarded for her payments in the course of a conspiracy, a defendant should not be punished for those same payments.

The government's supporting documentation demonstrates that the gain to the 19 alleged "co-conspirators" on the government's chart included a large number of payments by other women on that chart. For example, the defense can demonstrate on the existing record that: Hastings paid Grasso and Bello $5,000; Foley paid $5,000 each to Ms. Platt and Bello; Rosa and Dillon and Collins paid $5,000 to Bello; Sheehan paid $5,00 to Platt; Bride and Alexander paid at least $10,000 to Bello; and Tansey paid $5,000 to Hopkins. With another *Fatico* hearing, we have no doubt we could demonstrate many more un-deducted payments among putative co-conspirators.

To be sure, the government may take the position that not all the women whose gain was attributed to Ms. Platt were co-conspirators. But if so, payments between them were still improperly included as "losses," because none of them were victims, as they all made money from the tables (as the chart shows). Payments by women who profited are not "pecuniary harm."

2. The Current Record Establishes A Loss Amount
That Solves All Three Problems

A reasonable and legally acceptable loss measurement exists on the present record. This measurement avoids all three issues presented by the government's gain approach. In particular, the government has identified 15 women with a material connection to Platt who had actual losses approximating $75,000. (*See* Gov't Chart; *see also* S. Tr. 80). The defense does not dispute that these women are subject to connection to Ms. Platt pursuant to *Studley*, and there is no issue of co-conspirator gain or including amounts that are not losses. We believe the most efficient course would be to use this actual loss as the basis for Ms. Platt's resentencing.

Of course, the *most* efficient course at resentencing would be for the parties to agree on loss amount. Our understanding is that the government is not opposed in principal to an actual loss approach, but is not willing to agree to the above calculation. The government initially indicated that it might agree to an actual loss amount that included loss also attributable to Bello and Hopkins; the government then indicated it was not sure whether it could agree to such an approach. We discuss a potential approach along those lines below.

**C.     Applicable Guidelines Calculations**

Ms. Platt's proposed fraud loss amount of $75,000 yields an offense level of 21. Under the current Guidelines manual, the aggregate loss is $75,000 + $21,000

= $96,000.  Under U.S.S.G. §§ 2T1.1 and 2T4.1, the base offense level is 14.  With the seven-level enhancements the Court previously found applicable, the adjusted offense level is 21.  (The fraud loss is lower, and thus inapplicable, because under § 2B1.1(a) the base offense level is 7, there is an eight-point increase for loss amount, and then five more for the previous enhancements, yielding 20.)  Because Ms. Platt has no criminal history, this yields a Guidelines range of 37-46 months.

Solely for the purpose of advising the Court—and not because the parties have agreed—we also note that the applicable Guidelines range for an aggregate actual loss amount more than $100,000 and $250,000 or less is 46-57 months.  *See* U.S.S.G. § 2T4.1(F); 2B1.1(B)(1)(F).  That loss amount range may well encompass a reasonable estimate of the actual loss caused by the three defendants in this case.

## II.  THE COURT SHOULD IMPOSE A SIMILAR VARIANCE FROM THE GUIDELINES TO REACH A SENTENCE OF TIME SERVED

At the prior sentencing, the Court granted a substantial variance from the Guidelines—33 months below the bottom of the range.  We respectfully submit that a similar variance is warranted upon resentencing, to reach a sentence of time served.  Ms. Platt has demonstrably accepted responsibility for the harm she caused, she has suffered grievous personal losses through the course of this case, and she will struggle the rest of her life to make ends meet.  Further incarceration would not serve the purposes of sentencing.  Rather, a sentence of time served is

sufficient, but not greater than necessary, to comply with the purposes of sentencing.

### A. The History And Characteristics Of The Defendant Do Not Warrant Further Incarceration

Jill Platt is a changed woman from when she committed the offense conduct and from when the Court saw her last. Perhaps most significantly, she has come to accept responsibility for her actions. She expresses anguish for the harm that she caused, and that the tables caused more generally. The Court can see that in the letter she wrote, and we expect it will see it again at the resentencing.

Nor is it a surprise that seven months in prison would cause this change in perspective. Ms. Platt's letter describes how helping her cellmate learn to value charity caused her see how different her own offense conduct was than how she has always tried to be. Of course, prison is no easy place for anyone—it is a profoundly difficult place to live for a woman in her late 60s who has never had any previous contact with the criminal justice system.

In addition, Ms. Platt has suffered personal losses through the course of this case. First, her mother died, then her dear husband of almost 50 years died just before trial, and her 34-year-old son Jonathan died shortly after she was released on bail. There is no question that this prosecution has come during the worst period of Ms. Platt's life.

Jonathan's death also means that Ms. Platt has no one to help her financially. Indeed, the reason Jonathan moved to Connecticut was so Ms. Platt would have someone bringing in a steady income, and to help her around the house. Ms. Platt's late husband was the sole breadwinner of the house, and her son Christopher cannot afford to pay for even Ms. Platt's modest living expenses. As a result, Ms. Platt is destitute. The latest Addendum to the PSR makes clear that she has no assets to speak of, and is encumbered by a number of enormous debts—her husband's medical bills, a mortgage, tax debt, and so on. She is working as best she can at odd jobs, trying to take any opportunity that a convicted felon can find for paying work, but the reality is that she is living hand to mouth, and entirely dependent upon the charity of friends.

However, it is significant for sentencing purposes that none of this hardship has diminished the defining nature of Ms. Platt's character: her unflagging charity. She dedicated her time in prison to the care of her cellmate. She has provided a home and emotional support for Ms. Bello through her own difficult time recently. And these actions cap a lifetime of generosity to friends of family, described above, despite her own hardships. Indeed, Ms. Platt's commitment to the value of good works is the very thing that has caused her to accept responsibility for her crime and its harm. As she explains in her letter, she has come to see that that

conduct was antithetical to her good intentions in joining the tables, and the values she set for herself for the course of her life.

**B.     The Nature And Circumstances Of The Offense Do Not Warrant Further Incarceration**

In fashioning a sentence for Ms. Platt previously, the Court put "significant weight" on Platt's guilt, concluding that it could not "discern . . . a non-culpable explanation for her behavior." (S. Tr. 70, 75).  The Second Circuit has now affirmed the conviction, and thus there is now no dispute that Ms. Platt is culpable. We therefore respectfully submit that this factor should receive less controlling weight in her sentence, especially given the following considerations:

First, there is Ms. Platt's remorse.  Unlike previously, we expect the Court to see that her culpability and the harm she caused to vulnerable women are very much on the radar screen for Ms. Platt.  Of course, every defendant who stands before the Court for sentencing is culpable.  What is different about Ms. Platt, we believe, is that she has accepted responsibility.

Second, we ask the Court to bear in mind that Ms. Platt's motivation for joining the tables was of a piece with her generous character more generally.  We believe there is no dispute that she joined in order to pay for her husband's pacemaker, and that she gave the rest of the money she made to other women.  In addition, a good portion of the conduct she engaged in resulted in meaningful charity to vulnerable members of Ms. Platt's community.  Accordingly, despite the

harm it caused, we ask the Court to consider that the ultimate nature of her offense was not selfish and profit-driven. We believe this consideration should mitigate the weight of Ms. Platt's culpability.

Third, as discussed above, Ms. Platt's conduct was similar in many significant respects to women whom this Court sentenced to no prison time, or whom the government did not charge. We believe a time-served sentence is warranted to bring Ms. Platt's sentence in line with these women. *See* 18 U.S.C. § 3553(a)(6) (requiring sentencing court to "avoid unwarranted sentence disparities").

### C.     Deterrence Does Not Warrant Further Incarceration

The considerations of deterrence have been adequately addressed by the prison term Ms. Platt has already served. *See* 18 U.S.C. § 3553(a)(2)(C), (B). Indeed, the government appears to have conceded at the prior sentencing that specific deterrence was not much of a consideration at all. It "agree[d]" that Ms. Platt had "led an otherwise law-abiding life and she's a little bit older and she's probably learned her lesson based on this case." (S. Tr. 56). Specific deterrence therefore does not warrant further incarceration.

Moreover, a term of imprisonment of seven months is "sufficient, but not greater than necessary" to "afford adequate deterrence" to would-be participants in gifting tables. 18 U.S.C. § 3553(a)(2)(B). The tables attracted women who, like

Ms. Platt, had led law-abiding lives, and who were seeking social and financial support and empowerment.  There was no indication that any of these women would have joined if doing so had exposed them to a felony conviction, let alone a prison term.[1]  *See* A. Mitchell Polinsky & Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 28 J. Leg. Stud. 1, 12 (1999) ("less-than-maximal sanctions, combined with relatively high probabilities of apprehension, may be optimal" in the white-collar context, where "the disutility of being in prison at all may be substantial and the stigma and loss of earning power may depend relatively little on the length of imprisonment"); U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing* 56 (2004) ("deterrence" achieved by "'a short but definite period of confinement' for a larger proportion of these 'white collar' cases" (citation omitted)).

### D.    A Guidelines Sentence Is Not Warranted

At a minimum, a similar variance from the Guidelines to the one the Court previously imposed is warranted upon resentencing.  This Court previously observed that the offense conduct was outside the heartland of the Guidelines, and there is no reason to conclude otherwise.

Moreover, the irrationality of the loss tables—the principal driver of the Guidelines range—provides another reason for a substantial variance.  Ms. Platt's

---

[1] To the contrary, the government's theory at trial was that the legality of the tables was *material* to the women who joined.

offense level was principally determined by plugging the loss amount into the Guidelines' loss tables. These tables generate identical offense level increases by loss amount for all applicable fraud and tax crimes, without regard to the seriousness of the offense or the defendant's culpability. There is no rational basis for this approach to sentencing. *See, e.g.*, Kate Stith, *The Arc of the Pendulum: Judges, Prosecutors, and the Exercise of Discretion*, 117 Yale L.J. 1420, 1476 n.235 (2008) ("[T]he Guidelines' 'loss'-penalty tables appear to have been created out of whole cloth, without either statutory or empirical basis. The great weight the Guidelines attached to quantity has been devastatingly criticized, and nowhere explained." (citations omitted)); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) (describing the amount of loss as a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("patently absurd" calculations under fraud Guidelines require the court "to place greater reliance on the more general considerations set forth in section 3553(a) , as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences"), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).

Ms. Platt's case illustrates the injustice of the loss tables' approach. According to the tables, Ms. Platt should receive the same offense level adjustment for her loss as a defendant who had simply stolen the same amount, or embezzled

it, or caused a similar loss by running a Madoff-style Ponzi scheme.  *See* U.S.S.G. §§ 2B1.1(a)(2) ; 2T.1.1(a)(1); U.S.S.G. app. A.  There has never been a suggestion in this case that Ms. Platt's conduct was as serious as those examples.  Thus, even the Guidelines range proposed by the defense necessarily and irrationally treats the loss in this case as equal to that caused by much more serious crimes.  A substantial variance is therefore warranted because the Guidelines' dependency on the loss amount makes the resulting range an inappropriate benchmark for the severity of the crimes in this case.

## CONCLUSION

For the reasons set forth above, the Court should impose a non-Guidelines sentence of time served.

Dated:  March 29, 2016
    Brooklyn, New York                      Respectfully submitted,

                                            /s James Darrow

                                            James Darrow
                                            Assistant Federal Defender
                                            Federal Defenders of New York, Inc.
                                            Tel. (718) 407-7419
                                            Fax: (718) 855-0760
                                            james_darrow@fd.org

                                            *Attorneys for Jill Platt*